UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**ANNE-MARIE C. HERRICK**,

Plaintiff,

-against-

**METREX RESEARCH, LLC**, a division of
KaVo Kerr, a wholly owned subsidiary of
Danaher Corporation,

Defendant.

**COMPLAINT**

Civil Action No.: 1:20-cv-1542 (BKS/CFH)

*TRIAL BY JURY DEMANDED*

Plaintiff, **Anne-Marie C. Herrick**, (hereinafter referred to as "Plaintiff"), as and for

her complaint against the above-named Defendant, respectfully alleges the following:

## NATURE OF THE CLAIMS

1. This is an employment discrimination action which seeks declaratory and equitable

relief, compensatory and punitive damages, and other relief to redress acts of Defendant in

violation of: (a) the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §621, *et

seq.*); (b) Title VII of the Civil Rights Act of 1964 ("Title VII," 42 USC §2000-e, et seq.);

as well as (c) the New York State Human Rights Law, ("NYSHRL," Executive Law §290

*et seq.*).

2. Plaintiff's claim of employment discrimination is based on Defendant's decision

to terminate her employment as a National Accounts Manager ("NAM") with Defendant

because of her age and/or sex which took effect on December 15, 2017.

3. Plaintiff's claim of employment discrimination is also based on Defendant's

decision to fail to rehire Plaintiff to fill another open NAM position because of her age

and/or sex in February of 2018.

## JURISDICTION

4. The Court has subject matter jurisdiction over this action pursuant to 28 USC §§

1331 & 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADEA and Title VII.

5.  Additionally, Plaintiff's action asserts state law claims under the NYSHRL which are so related to the aforesaid federal claim that they form part of the same controversy. Accordingly, this Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 USC §1367.

## VENUE

6.  Venue is proper in the United States District Court for the Northern District of New York pursuant to  28 USC § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Northern District of New York.

## PARTIES

### Plaintiff

7.  Plaintiff resides in the City of Albany, County of Albany, State of New York.

8.  Plaintiff is a natural born United States citizen.

9.  Plaintiff is over 40 years of age, having been born in 1955.

10.  Plaintiff is a female.

### Defendant

11.  Upon information and belief, and at all times relevant hereto, Metrex Research, LLC,  was and continues to be a limited liability company organized in 1995 in the State of Wisconsin.

12.  Upon information and belief, and at all times relevant hereto, Metrex Research, LLC's principal office address was and continues to be 1717 West Collins Avenue, Orange, California 92867.

13.  Upon information and belief, and at all times relevant hereto, Metrex Research,

LLC, is a division of KaVo Kerr which also maintains an office at 1717 West Collins Avenue, Orange, California 92867.

14.  Upon information and belief, and at all times relevant hereto, Metrex Research, LLC, and KaVo Kerr share a Human Resources Department and are both in the "Family of Brands" operated by Danaher Corporation.

15.  Upon information and belief, Danaher Corporation is a corporation organized in the State of Delaware.  It is a conglomerate of many subsidiary companies including, Kavo Kerr and Metrex Research, LLC.  Its principal office address is 2200 Pennsylvania Avenue, N.W., Suite 800W, Washington, D.C.

16.  Upon information and belief, Danaher Corporation employs approximately 67,000 people worldwide, approximately 23,000 of which are employed in the United States.

17.  At all times relevant hereto, Defendant, Metrex Research, LLC, as a division of KaVo Kerr, a wholly owned subsidiary of Danaher Corporation, was Plaintiff's employer, as that term is defined in the ADEA, Title VII, and the NYSHRL.

## **FACTS APPLICABLE TO ALL CAUSES OF ACTION**

18.  In November 2015, Plaintiff was recruited by Defendant as a NAM to work for Metrex Research, LLC.

19.  Defendant prepared a November 17, 2015 offer letter which was presented to Plaintiff which she signed on November 19, 2015 and returned to Metrex Research, LLC. The said offer letter set forth the basic terms of Plaintiff's employment (i.e., start date of January 4, 2016, base salary, bonus program, and fringe benefits).

20.  At all times relevant hereto, Defendant, Metrex Research, LLC, sold consumable products and services in healthcare environments.  The products include enzymatic detergents, disinfectants, sterilants, liquid medical waste disposal products, hand hygiene

products, eye shields, and MRSA infection prevention products.

21.  Plaintiff was initially hired by and reported to Michael Welch, Metrex Research, LLC's Vice President of Sales, North America.

22.  As a NAM with Metrex Research, LLC, Plaintiff maintained a home office located in Albany, New York, and her sales territory included, but was not limited to, the territorial limits of the United States District Court for the Northern District of New York.

23.  Plaintiff was responsible for cultivating relationships with integrated delivery networks ("IDNs"), and group purchasing organizations ("GPOs").

24.  Plaintiff was responsible for preparing responses to requests for proposals ("RFPs") from the request for information ("RFI") stage through completion.

25.  Plaintiff set strategies for her sales team to execute on GPO opportunities, as well as protect vulnerable accounts.

26.  Plaintiff was qualified for her position as  a NAM with Metrex Research, LLC.

27.  Prior to being recruited by Defendant for her NAM position, Plaintiff possessed education in healthcare.

28.  Plaintiff had earned her Bachelor of Science degree in nursing from Hartwick College in Oneonta, New York and completed post-graduate nursing courses and training.

29.  Prior to being recruited by Defendant for her NAM position, Plaintiff possessed experience working in healthcare.

30.  From 1980 through 1996, Plaintiff was employed at the Samuel Stratton VA Medical Center located in Albany, New York.  During that time period, she was initially employed in nursing positions working in the Oncology and Critical Care Departments.  She then moved into  administrative and management positions.  At the end of her tenure, she had been promoted to the Regional Risk Manager responsible for twenty-three (23) VA

facilities.

31.   Prior to being recruited by Defendant for her NAM position, Plaintiff possessed both business and sales experience.

32.   In 1993, Plaintiff founded "Love/40 Inc.," a high-end, natural-fiber tennis apparel company.  Between 1994 and 1995, the sales grew to two million dollars ($2,000,000.00). Plaintiff was awarded a New York State Economic Development Grant to market in Japan as part of a trade mission.   Plaintiff marketed and negotiated with 15 major trading companies in Osaka and Tokyo to serve as potential agents which resulted in a licensing agreement.

33.   From 1998 through 2002, Plaintiff was employed by Xerox Corporation in Albany, New York.  Plaintiff held the title as Document Solutions Executive.  Plaintiff sold business-to-business capital equipment, including networked printing/scanning systems, repository and image routing software known as the Docushare and Flowport Software, to government agencies and major accounts.  Plaintiff was ranked as the number one Account Manager in sales revenue for all major accounts in the New England, New York and Metro New Jersey territories in June 2000, resulting in her receiving the President's Club Award in 2001.

34.   From 2003 through 2005, Plaintiff was employed by Beckman Coulter, Inc., working out of Albany, New York covering upstate New York and all of New England as an Account Sales Consultant in Clinical Diagnostics.  Plaintiff was  responsible for selling a broad portfolio of diagnostic instruments and solutions into the hospital market segment as well as managing the sales territory.   Plaintiff lead a team which re-established the company's presence in abandoned territory and generated eight million dollars ($8,000,000.00) in new sales during a 2-year period.  Plaintiff also created and implemented

a sales strategy which resulted in the acquisition of a large customer in a highly competitive market.  This acquisition resulted in an additional Six Million Dollars ($6,000,000.00) in revenue.

35.  From 2005 to 2014, Plaintiff was employed by Johnson and Johnson ("J&J") in its Ortho Clinical Diagnostics Division ("Ortho").  From 2005 to 2012, Plaintiff held the position as an Account Manager in Albany, New York covering a large sales territory consisting of New York, Massachusetts and Vermont.  Plaintiff was responsible for selling Vitros diagnostic instruments and solutions, attaining market share in the hospital market segment, and managing her sales territory.   During this time, Plaintiff successfully re-established the presence of Ortho by capturing its market share while maintaining the company's profitability.  Plaintiff consistently performed in the top ten to fifteen percent (10-15%) of Account Managers.  Plaintiff demonstrated a record of exceeding her average annual target of five percent (5%) by increasing annual revenue by ten percent (10%).  In fact, in 2006, Plaintiff increased sales by one-hundred and sixty-seven percent (167%) in her territory.  That year, Plaintiff was an Ambassador's Club Winner, achieving one-hundred and twenty-four percent (124%) of her targeted plan.  Plaintiff was asked to train new Account Managers on subjects including contracting with J&J Finance.  Plaintiff was responsible for negotiating one of the largest, most complicated, client sales over a 5-year process.  Plaintiff assembled and facilitated a cross-functional troubleshooting team to address  testing performance results during Board review.  Plaintiff was chosen for promotion and additional responsibilities during periods when the company was reorganizing and downsizing.

36.  In 2012, Plaintiff was promoted by J&J to Customer Solutions Manager for the territory consisting of New York and Connecticut.  Plaintiff was responsible for driving regional sales growth of the Vitros line of solutions and products, including Automation,

Middleware and ValueMetrex services. Plaintiff was a Top Tier Performer for instrument and solution sales, a Guest Trainer and mentor for new regional hires, and invited to train and act as resource for issues such as financial acumen, accountable care organizations and health care reform.

37. In 2012, Plaintiff was again promoted by J&J to Regional Account Executive/ Health Systems Executive Northeast US. In this position, Plaintiff was responsible for applying her expertise in health care reform to cultivate relationships at the highest levels in corporate accounts and designated integrated delivery networks, driving positive business outcomes. Plaintiff was responsible to manage twenty-nine million dollars ($29,000,000.00) in revenue. Plaintiff remained in this position until July 1, 2014, when Ortho became its own company.

38. On July 1, 2014, J&J divested from its ownership and control of Ortho. Plaintiff remained employed with Ortho as a Regional Account Executive/ Health Systems Executive Northeast US performing the same basic job duties as set forth above.

39. Plaintiff was qualified to perform her job duties as a NAM for Defendant.

40. During Plaintiff's tenure with Defendant, there were no substantial issues with her job performance.

41. Plaintiff was regularly recognized regarding her performance by: (a) Mr. Welch, as her immediate supervising Vice President; (b) Steve Fanning, the General Manager who left in Metrex Research, LLC, in 2017; (c) Dr. Yatao Liu, the Director of Global Business Affairs; and (d) many of her peers who included, Regional Managers, Sales Associates, and Senior Leaders within the external GPOs and National Accounts.

42. Plaintiff was told that her ability to cultivate relationships and garner trust is what allowed her organization at Metrex Research, LLC, to be successful in winning substantial,

profitable contracts.

43.   In addition, Plaintiff trained, supported and set strategies for the sales associates as well as trained and groomed a Strategic Account Manager to move-up to handle some of the National Accounts when a vacancy presented itself.

### Plaintiff's 2016 Performance

44.   In February 2016, Mr. Welch provided Plaintiff with a copy of the "2016 Sales Incentive Plan, National Accounts Manager."   Plaintiff was informed that her performance would be rated on three factors: (i) Company Net Sales Out; (ii) Regional Net Sales Out; and (iii) "Management by Objectives" (MBOs).

45.   The first performance factor was "Company Net Sales Out," and it awarded NAMs each quarter for sales of products against the established sales targets for their particular organization.  On a quarterly basis, NAMs were eligible to receive a bonus for sales at or above the sales threshold of ninety-five percent (95%) of target.

46.   The second performance factor was "Regional Net Sales Out," and it awarded NAMs each quarter for sales of products against the established sales targets for the region for which they were aligned (Plaintiff was in the East region). On a quarterly basis, NAMs were eligible to receive a bonus for sales at or above the sales threshold of ninety-five percent (95%) of target.

47.   The third performance factor was MBOs, which set forth the areas on which Plaintiff's supervisor directed her to focus.  MBOs were to be set for each quarter, 30 days prior to the start of the subsequent quarter.  For on-target MBO achievement, the quarterly value of this performance metric was  $5,000.00, and the annual value of this performance metric was $20,000.00.

48. Prior to the commencement of the second quarter in 2016, Mr. Welch provided

Plaintiff with a copy of the "2016 MBO's the Strategic Group."

49.  Throughout 2016,  Plaintiff worked very hard on behalf of Defendant to perform all of her job duties as the NAM.  Plaintiff received payment of her $120,000.00 base salary, plus substantial bonuses which totaled an additional $30,000.00.

50.  On January 26, 2017, Plaintiff received her 2016 Performance Review.  She was pleased to receive several compliments regarding her job performance by Mr. Welch.  For example, he stated:

- "Annie has done a tremendous job getting things moving within her covered accounts. Although the company is currently behind on our growth, Annie is definitely taking a leadership role here at Metrex."

- "Annie has quickly come up to speed with understanding strategy and vision in order to implement actions here at Metrex. She has brought great knowledge and new ideas around assessing the situation. She has taken on a great deal this year with the GPO contract RFP's and implementing new standard work."

- "Annie has developed followership with the field in a very short amount of time. She has taken her previous knowledge of the market, customers and competition to develop new strategies around managing large customers. In particular she has really moved the needle with NYU and GNYHA leveraging her relationships as well as internal partners to gain access. This will prove to help us grow the business in 2017."

- "Annie comes to the table with proactively making recommendations for future improvements. She has worked with Kyle and Stephanie to come up with new standard work around GPO contract focus. This will be a key initiative for our growth in 2017 with all of our contracts."

- "Annie is always engaged with the team and takes initiative to practice and apply new skills to continuously improve performance. She is an excellent communicator and collaborates openly and clearly with peers and internal stakeholders."

- "Annie consistently makes decisions based on sound judgment regardless of circumstances and pressures. She makes commitments that she can keep; promptly and honestly alerts leadership to problems achieving a commitment."

- "Annie is doing a great job moving forward and understanding where our products fit and who the contacts would be for each different product category."

- "Annie's objective really set out a big goal for her. She set a strategy in place and made her commitments. She achieved her milestones with her continued persistence and drive."

51. Plaintiff's 2016 performance appraisal was so positive that it resulted in her receiving an increase in her base salary from $120,000.00 to approximately $126,000.00.

### Plaintiff's 2017 Performance

52. In early 2017, Plaintiff was informed that her performance would continue to be rated on the same three factors as was done in 2016: (i) Company Net Sales Out; (ii) Regional Net Sales Out; and (iii) MBOs, with the same bonus structure.

53. In March 2017, Plaintiff was advised that Mr. Welch was leaving his employment with Metrex Research, LLC.  Plaintiff greatly enjoyed working with him.  He always treated her with respect as a woman.  Plaintiff felt that he also valued and appreciated her years of experience, knowledge, education, and skills.

54. Plaintiff requested a performance appraisal from Mr. Welch for the first quarter of 2017 when he was her supervisor, but she was told that the company would not permit this.

55. After Mr. Welch left his employment with Metrex Research, LLC, Plaintiff was directed to report to Mark Baldwin, who was then promoted to the North American Director of Sales for Danaher.

56. Mr. Baldwin is a male who was then approximately 45 years of age and substantially younger than Plaintiff who was then almost 62 years of age.

57. Unlike Mr. Welch, Plaintiff did *not* feel that Mr. Baldwin respected her as a woman.  He would send her e-mails wherein he would address and/or refer to other females and her in a pejorative terms.

58. Plaintiff believed that her gender should have nothing to do with her employment, and she felt the Mr. Baldwin was being condescending to female employees.

59.  Plaintiff did not feel that Mr. Baldwin respected, valued and/or appreciated her years of experience, knowledge, education, and skills.  Plaintiff always was made to feel that Mr. Baldwin was interested in the younger members of the sales force.

60.  This feeling was further caused by the fact that Mr. Baldwin spent no time communicating with Plaintiff, as her supervisor, to provide her with any leadership and/or guidance.  He also directed her not to attend important meetings with other executives of Defendant as well as current and/or potential customers.

61.  Since Plaintiff's performance was supposed to be rated on MBOs, it was important that she have regular communications with her supervisor so that he could provide her with feedback regarding her MBOs.  This did not occur when Mr. Baldwin was Plaintiff's supervisor.

62.  In March 2017, Plaintiff requested that Mr. Baldwin provide her with the statement explaining her MBOs.  On March 26, 2017, she received an e-mail from Mr. Baldwin requesting that she send him a statement of the MBOs that she felt would be reasonable.  Plaintiff complied with Mr. Baldwin's request, but did not receive his approval of her proposed MBOs.

63.  On August 2, 2017, Plaintiff received an e-mail from Mr. Baldwin which attached a *revised* "2017 Sales Incentive Plan, National Accounts Manager." In response to Plaintiff's concerns regarding her MBOs, Mr. Baldwin advised her that the MBO factor was being eliminated from her 2017 performance rating.

64.  Mr. Baldwin claimed that MBOs were too arbitrary.  The decision in this regard made it impossible for Plaintiff to earn the potential bonus of $5,000.00/quarter if she accomplished her MBOs which she had been previously promised.

65.  The revised "2017 Sales Incentive Plan, National Accounts Manager" rated

Plaintiff's performance on two factors: (i) Company Net Sales Out; and (ii) GPO Sales.

66.   The first performance factor was "Company Net Sales Out," and it awarded NAMs each quarter for sales of products against the established sales targets for their particular organization.  On a quarterly basis, NAMs were eligible to receive a bonus for sales at or above the sales threshold of ninety-five percent (95%) of target.

67.   The second performance factor was "GPO Sales," and it awarded NAMs each quarter for sales of products against the established sales targets for the GPOs with which they were aligned.  On a quarterly basis, NAMs were eligible to receive a bonus for sales at or above the sales threshold of ninety-five percent (95%) of target.

68.   Plaintiff worked very hard for Defendant in 2017.  A table was provided to her setting forth both her GPO Sales and Company Net Sales Out during the first three quarters of 2017.

69.   During the first quarter of 2017, Plaintiff's GPO Sales and Company Net Sales Out, were as follows:

| Factor | January | February | March | Total |
|---|---|---|---|---|
| GPO Net Sales | $2,100,971 | $1,940,452 | $2,355,887 | $6,397,310 |
| GPO Plan | $2,244,795 | $2,251,544 | $2,401,236 | $6,897,575 |
| % to Plan | 94% | 86% | 98% | 93% |
| Company Net Sales | $3,713,560 | $3,804,331 | $4,139,849 | $11,657,740 |
| Company Plan | $3,784,764 | $3,865,011 | $4,505,314 | $12,155,089 |
| % to Plan | 98% | 98% | 92% | 96% |

70.   During the second quarter of 2017, Plaintiff's GPO Sales and Company Net Sales Out, were as follows:

| Factor | April | May | June | Total |
|---|---|---|---|---|
| GPO Net Sales | $2,078,440 | $2,030,019 | $2,398,447 | $6,506,906 |
| GPO Plan | $2,134,334 | $2,145,435 | $2,331,267 | $6,611,036 |
| % to Plan | 97% | 95% | 103% | 98% |
| Company Net Sales | $5,123,051 | $5,300,335 | $5,829,701 | $16,253,087 |
| Company Plan | $5,452,626 | $5,409,490 | $5,786,941 | $16,649,057 |
| % to Plan | 94% | 98% | 101% | 98% |

71.  As the foregoing tables demonstrate, Plaintiff's performance in the first three quarters of 2017 regularly exceeded the 95% threshold established by Defendant.  As a result, Plaintiff earned and received bonuses totaling $13,000.00 in addition to her base pay.

72.  In November 2017, Mr. Baldwin approved Metrex Research, LLC, hiring Jeffrey W. Owen as an "Area Manager/NAM."  Like Mr. Baldwin, Mr. Owen was a male and substantially younger than Plaintiff.

73.  Mr. Owen was a self-proclaimed "hot-shot" who asserted to Plaintiff that he was brought from Texas to "fix Metrex."  He appeared to have a very friendly relationship with Mr. Baldwin.  During a business trip to New York City following Thanksgiving 2017, Mr. Owen told Plaintiff that he was going to take her position as the NAM.

74.  Plaintiff did not take Mr. Owen's claim seriously.  Plaintiff was far more experienced than him and Plaintiff was successfully performing all of her job duties as is illustrated by the above quarterly figures.

**Plaintiff's Employment was Terminated on December 15, 2017**

75.  Plaintiff's NAM position with Defendant was terminated on December 15, 2017.

76.  Plaintiff was devastated by this termination.

77.  Mr. Baldwin explained to her that Metrex Research, LLC, wanted "more feet on the street." This came as a complete surprise to Plaintiff.  Metrex Research, LLC, had been

telling her and the other members of the sales force that its focus was on GPOs.  Mr. Baldwin's claim that Metrex Research, LLC, wanted "more feet on the street" was completely opposite to its stated goal of focusing on GPOs.

78.   Plaintiff requested an updated table from Mr. Baldwin documenting her performance in the fourth quarter 2017, so Plaintiff could calculate the performance bonus which she earned.  He did not provide her with the updated information, but told her that Plaintiff had earned a fourth quarter bonus of $5,250.00.

79.   Plaintiff also requested that Mr. Baldwin provide her with her performance review for 2017 so she could document her excellent performance for Metrex Research, LLC.  He refused to do so.

80.   Plaintiff was then provided with a "severance package" which: (a) contained a broad release of any potential claims she may have against Defendant, including her claims for violations of the ADEA, Title VII, and the NYSHRL; (b) released her claim for bonuses; and (c) precluded her from applying for open positions with any of the many Danaher related companies.

81.   Plaintiff strongly believed that Mr. Baldwin decided to terminate her employment so that he could replace her with Mr. Owen, a substantially younger, less qualified male. Plaintiff believed that she was terminated from her position because of her age and gender in violation of the ADEA, Title VII, and the NYSHRL.

82.   Plaintiff strongly believed that Defendant owed her a bonus for the fourth quarter 2017.

83.   Plaintiff was also aware that another NAM position was posted by Metrex Research, LLC, for which she was very qualified and wanted to apply.

84.  As such, Plaintiff refused to accept the severance package.

85.  Upon information and belief, following Plaintiff's termination, several of her accounts were transferred to Mr. Owen, and he began to perform the job duties that she previously performed as a NAM.  In effect, Plaintiff was replaced by Mr. Owen.

86.  Defendant failed and refused to pay Plaintiff the bonus she earned for the fourth quarter 2017.

### Plaintiff Applied for the Open NAM Position

87.  At the time of Plaintiff's job termination, Metrex Research, LLC,  was posting for an open position as a NAM-Extended Care.

88.  This position was previously occupied by Lee Roberts, a male, who voluntarily left the position on November 17, 2017 to pursue another opportunity.

89.  The job posting set forth sections entitled: (a) "About Us" which describes the relationship between Metrex Research, LLC, KaVo Kerr, and Danaher Corporation; (b) "Description" which describes the job duties;  (c) "Qualifications" which describes the qualifications a successful candidate must possess; and (d) "Danaher Corporate Overview" which provides information on Danaher Corporation.

90.  Plaintiff then met all of the requirements for the NAM-Extended Care position.

91. While Plaintiff was upset and disappointed that Defendant allowed Mr. Baldwin to terminate her employment, Plaintiff had loved her job and knew that she  would no longer have to work with him if she was rehired for the open NAM position.

92.  Therefore, Plaintiff applied for the open NAM position on January 2, 2018.

93.  The receipt of her application was acknowledged electronically by the "Danaher Talent Network" on January 2, 2018.

94.  Plaintiff also followed up on her application with other management and Human Resources employees of Defendant.

95.  Surprisingly, Plaintiff did not receive any other response from Defendant nor was she provided with an interview for the open NAM position.

96.  Upon information and belief, in February 2018, Defendant hired Patrick Lerg for the open NAM, Extended Care position.

97.  Upon information and belief, Mr. Lerg is a male who is substantially younger than Plaintiff, and is less qualified for the open NAM position.

### Plaintiff's Charge of Employment Discrimination with EEOC

98.   In September 2018, Plaintiff timely filed with the United Stated Equal Employment Opportunity Commission (EEOC) her charge of employment discrimination against Defendant alleging that her rights were violated under the ADEA, Title VII, and the NYSHRL.

99.  In September 2020, Plaintiff received the EEOC's September 17, 2020 *Dismissal and Notice of Rights*.

100.  Plaintiff timely pursued all applicable administrative remedies.

101.  Plaintiff filed this action within 90-days of her receipt of the said *Dismissal and Notice of Rights*.

### AS AND FOR A FIRST CAUSE OF ACTION
(Willful Violation of the ADEA-Plaintiff's Termination)

102.  Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "101" above as if said paragraphs were set forth herein at length.

103.  The ADEA declares, in relevant part, that it shall be unlawful for an employer to discriminate against an employee who is 40 years of age or older with respect to her compensation, terms, conditions, or privileges of employment, because of her age.  29 USC §623(a)(1).

104.  Under the ADEA, an employer is defined as a person engaged in an industry

affecting commerce who has twenty (20) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year of the alleged violation. 29 USC §630(b).

105.  Defendant meets the definition of an "employer" as defined by the ADEA.

106.  At all times relevant hereto, Defendant was Plaintiff's employer for the time period between January 4, 2016 and December 15, 2017.

107.  At all times relevant hereto, Plaintiff was an employee of Defendant who is over 40 years of age and is a member of the class protected by the ADEA.

108.  At all times relevant hereto, Plaintiff was qualified to perform her job duties with Defendant.

109.  At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of her position as a NAM for Defendant.

110.  During the time period between January 4, 2016 and December 15, 2017, Plaintiff was employed by Defendant successfully fulfilling her job duties as a NAM.

111.  Plaintiff suffered an adverse employment action when Defendant decided to terminate her employment effective December 15, 2017.

112.  Defendant's foregoing decision would not have been made but for Plaintiff's age.

113.  Defendant willfully violated Plaintiff's rights under the ADEA.

114.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under the ADEA, she has been damaged.

115.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under the ADEA, her salary and benefits ended on December 15, 2017.

116.   Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.  As such, she will continue to suffer economic damages as a result of Defendant's willful and unlawful decision to terminate her employment.

### AS AND FOR A SECOND CAUSE OF ACTION
(Willful Violation of the ADEA-Failure to Hire Plaintiff )

117.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "116" above as if said paragraphs were set forth herein at length.

118.   The ADEA declares that it shall be unlawful for an employer to fail or refuse to hire an employee who is 40 years of age or older because of her age.  29 USC §623(a)(1)

119.   Under the ADEA, an employer is defined as a person engaged in an industry affecting commerce who has twenty (20) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year of the alleged violation. 29 USC §630(b).

120.   Defendant meets the definition of an "employer" as defined by the ADEA.

121.   At all times relevant hereto, Plaintiff was an individual who is over 40 years of age and is a member of the class protected by the ADEA.

122.   In January and February, 2018, Defendant was posting for an open position referred to as NAM-Extended Care.

123.   At all times relevant hereto, Plaintiff was qualified to perform the job duties of the open position as NAM-Extended Care.

124.   At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of the said open position as a NAM-Extended Care.

125.   Plaintiff submitted her application for the open NAM position on January 2,

2018, the receipt of which was acknowledged electronically by the "Danaher Talent Network."

126.   Plaintiff did not receive any other response from Defendant, nor was she provided with an interview for the open NAM position.

127.   Upon information and belief, in February 2018, Defendant hired Patrick Lerg for the open NAM, Extended Care position.

128.   Upon information and belief, Mr. Lerg is a male who is substantially younger than  Plaintiff, and is less qualified for the open NAM position.

129.   Plaintiff suffered an adverse employment action when Defendant decided to not consider or hire her for the open NAM-Extended Care position.

130.   Defendant's foregoing decision would not have been made but for Plaintiff's age.

131.   Defendant willfully violated Plaintiff's rights under the ADEA.

132.   As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under the ADEA, she has been damaged.

133.   As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under the ADEA, she was precluded from receiving the salary and benefits as the NAM-Extended Care position.

134.   Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.  As such, she will continue to suffer economic damages as a result of Defendant's willful and unlawful decision to not hire her to fill the NAM-Extended Care position.

### AS AND FOR A THIRD CAUSE OF ACTION
(Violation of Title VII-Plaintiff's Termination)

135.   Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "134" above as if said paragraphs were set forth herein at length.

136.  Title VII declares, in relevant part, that it shall be unlawful for an employer to discharge an employee, or otherwise discriminate against her with respect to her compensation, terms, conditions, or privileges of employment, because of her sex.  42 U.S.C.§2000e-2(a)(1).

137.  Title VII defines an "employer" to include any organization like Defendant which employs 15 or more employees in a calendar year.  42 U.S.C.§2000e(b).

138.  Defendant meets the definition of an "employer" as defined by Title VII.

139.  At all times relevant hereto, Defendant was Plaintiff's employer for the time period between January 4, 2016 and December 15, 2017.

140.  At all times relevant hereto, Plaintiff was an employee of Defendant who is a female and a member of the class protected by Title VII.

141.  At all times relevant hereto, Plaintiff was qualified to perform her job duties with Defendant.

142.  At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of her position as a NAM for Defendant.

143.  During the time period between January 4, 2016 and December 15, 2017, Plaintiff was employed by Defendant successfully fulfilling her job duties as a NAM.

144.  Plaintiff suffered an adverse employment action when Defendant decided to terminate her employment effective December 15, 2017.

145.  Defendant's foregoing decision would not have been made but for Plaintiff's sex.

146.  Defendant willfully violated Plaintiff's rights under Title VII.

147.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under Title VII, she has been damaged.

148.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under Title VII, her salary and benefits ended on December 15, 2017.

149.  Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.  As such, she will continue to suffer economic damages as a result of Defendant's willful and unlawful decision to terminate her employment.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Willful Violation of Title VII-Failure to Hire Plaintiff )

150.  Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "149" above as if said paragraphs were set forth herein at length.

151.  Title VII declares that it shall be unlawful for an employer to fail or refuse to hire an employee because of her sex.  42 U.S.C. §2000(e)-2(a)(1)

152.  Title VII defines an "employer" to include any organization like Defendant which employs 15 or more employees in a calendar year.  42 U.S.C.§2000e(b).

153.  Defendant meets the definition of an "employer" as defined by Title VII.

154.  At all times relevant hereto, Plaintiff was an individual who is a female and a member of the class protected by Title VII.

155.  In January and February, 2018, Defendant was posting for an open position referred to as NAM-Extended Care.

156.  At all times relevant hereto, Plaintiff was qualified to perform the job duties of the open position as NAM-Extended Care.

157.  At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of the said open

position as a NAM-Extended Care.

158.  Plaintiff submitted her application for the open NAM position on January 2, 2018, the receipt of which was acknowledged electronically by the "Danaher Talent Network."

159.  Plaintiff did not receive any other response from Defendant, nor was she provided with an interview for the open NAM position.

160.  Upon information and belief, in February 2018, Defendant hired Patrick Lerg for the open NAM, Extended Care position.

161.  Upon information and belief, Mr. Lerg is a male and is less qualified for the open NAM position.

162.  Plaintiff suffered an adverse employment action when Defendant decided to not consider or hire her for the open NAM-Extended Care position.

163.  Defendant's foregoing decision would not have been made but for Plaintiff's sex.

164.  Defendant willfully violated Plaintiff's rights under Title VII.

165.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under Title VII, she has been damaged.

166.  As a direct and proximate result of Defendant's willful violation of Plaintiff's rights under Title VII, she was precluded from receiving the salary and benefits as the NAM-Extended Care position.

167.  Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.  As such, she will continue to suffer economic damages as a result of Defendant's willful and unlawful decision to not hire her to fill the NAM-Extended Care position.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Violation of NYSHRL-Plaintiff's Termination)

168.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "167" above as if said paragraphs were set forth herein at length.

169.   At all times relevant hereto, the NYSHRL declared it to be an unlawful discriminatory practice for an employer, because of an individual's age and/or sex to discharge from employment such individual, or discriminate against such individual in the terms, conditions or privileges of employment.  Executive Law §296(1)(a).

170.   At all times relevant hereto, the NYSHRL defined an employer as any private, for profit business, which employs four (4) or more people.  Executive Law §292(5).

171.   At all times relevant hereto, Defendant was Plaintiff's employer, as the term employer is defined in the NYSHRL for the time period between January 4, 2016 and December 15, 2017.

172.   At all times relevant hereto, Plaintiff was an employee protected by the NYSHRL.

173.   At all times relevant hereto, Plaintiff was qualified to perform her job duties with Defendant.

174.   At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of her position as a NAM for Defendant.

175.   During the time period between January 4, 2016 and December 15, 2017, Plaintiff was employed by Defendant successfully fulfilling her job duties as a NAM.

176.   Plaintiff suffered an adverse employment action when Defendant decided to terminate her employment effective December 15, 2017.

177.  Defendant's foregoing decision would not have been made but for Plaintiff's age

and/or sex.

178.  Defendant violated Plaintiff's rights under the NYSHRL.

179.  As a direct and proximate result of Defendant's violation of Plaintiff's rights under the NYSHRL, she has been damaged.

180.  As a direct and proximate result of Defendant's violation of Plaintiff's rights under the NYSHRL, her salary and benefits ended on December 15, 2017.

181.  Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.  As such, she will continue to suffer economic damages as a result of Defendant's unlawful decision to terminate her employment.

182.  Plaintiff has and will continue to suffer mental anguish and emotional distress resulting from Defendant's unlawful decision to terminate her employment.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of NYSHRL-Failure to Hire Plaintiff )

183.  Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "182" above as if said paragraphs were set forth herein at length.

184.  At all times relevant hereto, the NYSHRL declared it to be an unlawful discriminatory practice for an employer, because of an individual's age and/or sex to refuse to hire or employ an individual, or discriminate against such individual in the terms, conditions or privileges of employment.  Executive Law §296(1)(a).

185.  At all times relevant hereto, the NYSHRL defined an employer as any private, for profit business, which employs four (4) or more people.  Executive Law §292(5).

186.  At all times relevant hereto, Plaintiff was an individual protected by the NYSHRL.

187.  In January and February, 2018, Defendant was posting for an open position

referred to as NAM-Extended Care.

188.  At all times relevant hereto, Plaintiff was qualified to perform the job duties of the open position as NAM-Extended Care.

189.  At all times relevant hereto, Plaintiff possessed and continues to possess the requisite skill, experience, education, and other job-related requirements of the said open position as a NAM-Extended Care.

190.  Plaintiff submitted her application for the open NAM position on January 2, 2018, the receipt of which was acknowledged electronically by the "Danaher Talent Network."

191.  Plaintiff did not receive any other response from Defendant, nor was she provided with an interview for the open NAM position.

192.  Upon information and belief, in February 2018, Defendant hired Patrick Lerg for the open NAM, Extended Care position.

193.  Upon information and belief, Mr. Lerg is a male, who is substantially younger than Plaintiff, and less qualified for the open NAM position.

194.  Plaintiff suffered an adverse employment action when Defendant decided to not consider or hire her for the open NAM-Extended Care position.

195.  Defendant's foregoing decision would not have been made but for Plaintiff's age and/or sex.

196.  Defendant violated Plaintiff's rights under the NYSHRL.

197.  As a direct and proximate result of Defendant's violation of Plaintiff's rights under the NYSHRL, she has been damaged.

198.  As a direct and proximate result of Defendant's violation of Plaintiff's rights under the NYSHRL, she was precluded from receiving the salary and benefits as the NAM-

Extended Care position.

199.   Although Plaintiff continues to look for a comparable job, she has been unsuccessful in securing another comparable employment position.   As such, she will continue to suffer economic damages as a result of Defendant's willful and unlawful decision to not hire her to fill the NAM-Extended Care position.

200.  Plaintiff has and will continue to suffer mental anguish and emotional distress resulting from Defendant's unlawful decision to refuse to hire her for the NAM-Extended Care position.

## DEMAND FOR A JURY TRIAL

201.  Plaintiff demands a trial by jury of all matters asserted in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff demands judgment against Defendant and prays that the Court:

(a)  award damages, in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00), plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, back pay, front pay, additional wages and compensation, bonuses, out-of-pocket expenses, retirement benefits, seniority, raises, health insurance reimbursement, life insurance and/or any and all other benefits of employment;

(b)  award damages, in an amount to be determined at trial, but in no event less than Two Hundred Thousand Dollars ($200,000.00), to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for mental anguish, humiliation, embarrassment, stress, anxiety, physical and emotional pain and suffering, emotional distress and physical ailments;

(c) a determination that Defendant's violation of the ADEA was willful and a further award of liquidated damages available under the ADEA;

(d)  a determination that Defendant's violation of Title VII and/or the NYSHRL was intentional, and a further award of punitive damages to deter Defendant and others from engaging in similar conduct,  in an amount to be determined at trial, but in no event less than the fullest extent permitted by law;

(e)   award Plaintiff the costs and disbursements she has incurred in this action, including witness and expert fees;

(f)   award reasonable attorney's fees to the fullest extent permitted by law;

(g)   award Plaintiff such pre and post judgment interest as is permitted by law; and

(h)   granting such other and further relief this Court deems just and proper.

Dated: December 11, 2020

DuCHARME CLARK, LLP

By: s/ *John B. DuCharme*

John B. DuCharme, Esq.
Bar Roll No.: 104 262
646 Plank Road - Suite 204
Clifton Park, New York 12065
Phone: 518-373-1482
Fax: 518-373-8758
e-mail: jducharme@nycap.rr.com